IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOMMIE CARTER,

                 Plaintiff,

    v.

JOLINDA J. WATERMAN,

                 Defendant.

OPINION AND ORDER

13-cv-742-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOMMIE CARTER,

                 Plaintiff,

    v.

SANDRA M. ASHTON,
RYAN P. ARMSON, TRACY R.
KOPFHAMER, MIKE A. MORRISON,
JASEN B. MILLER, JOSEPH W.
CICHONIWICZ, TROY HERMANS,
CRAIG A. TOM and PHILIP J. KERCH,

                 Defendants.

OPINION AND ORDER

14-cv-399-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Plaintiff Tommie Carter is proceeding in these cases on claims that prison officials failed to provide medical care for his chest pain in December 2011 (case no. 13-cv-742-bbc) and used excessive force against him in February 2013 (case no. 14-cv-399-bbc). On

1

December 10, 2015, a hearing was held on the parties' cross motions for sanctions. Defendants were represented at the hearing by assistant Wisconsin Attorney General Peter Rank; plaintiff represented himself.

In their motion, defendants argue that plaintiff should be sanctioned for falsifying evidence in the context of case no. 13-cv-742-bbc. In his motions for sanctions, plaintiff alleges that numerous prison officials are retaliating against him in many ways, ranging from slights such as refusing to notarize documents to shocking misconduct such as physical and sexual assaults. (Plaintiff filed two motions for sanctions, one of which he filed in both case no. 13-cv-742-bbc and case no. 14-cv-399-bbc and one that he filed in case no. 14-cv-399-bbc only.) Other motions are pending as well, including motions for summary judgment in both cases, but I have stayed consideration of those other motions until the motions for sanctions are resolved.

Having considered the evidence presented by both sides at the hearing as well as the parties' written submissions, I am granting defendants' motion for sanctions and denying plaintiffs' motions. I find by clear and convincing evidence that plaintiff falsified both his summary judgment submissions in case no. 13-cv-742-bbc and his allegations of retaliation in case no. 14-cv-399-bbc. Because falsifying evidence and falsely accusing officials of violent and criminal behavior are serious abuses of the judicial process, I am dismissing both of plaintiff's cases as a sanction for his misconduct. All other pending motions will be denied as moot.

OPINION

The parties do not discuss the burden of proof for obtaining sanctions in their motions. There is some uncertainty in the case law on this issue. Negrete v. National R.R. Passenger Corp., 547 F.3d 721, 724 (7th Cir. 2008) (noting that court of appeals had applied clear and convincing evidence standard in some cases and preponderance of the evidence standard in other cases). Because it makes no difference to the outcome of the parties' motions, I will assume that the more demanding clear and convincing evidence standard applies.

I will consider first whether each side has proven their allegations of misconduct. Then I will consider whether sanctions are appropriate and, if so, what kind.

A. Alleged Falsified Documents

In case no. 13-cv-742-bbc, plaintiff alleged in his complaint that defendant Jolinda Waterman, a nurse at the prison where plaintiff was housed, refused to see plaintiff on December 28, 2011, even though he was experiencing "intense chest pain" and spitting up blood. After screening his complaint, I allowed plaintiff to proceed on a claim under the Eighth Amendment. Dkt. #13. (All docket citations in this section of the opinion are to case no. 13-cv-742-bbc.)

On August 20, 2015, defendant Waterman filed a motion for summary judgment in which she argued that she could not be held liable because she had not been informed that plaintiff needed medical attention and because plaintiff had not shown that he had been

harmed by any failure to treat him. Dkt. #64. Included in plaintiff's opposition materials to defendants' summary judgment motion were health service requests dated December 28, 29 and 30, 2011, in which plaintiff says that he was experiencing "intense chest pain" and needed medical treatment. Dkt. #73-1, exhs. 3-5. In the December 28 request, plaintiff says that he informed a sergeant of his chest pain and the sergeant said that he would inform Waterman about plaintiff's situation. Id. at exh. 3. The request includes a signature for "Mary Miller," who is the health services unit manager, but the only response on the request is the word "noted." Id. In the December 29 request, plaintiff wrote that a sergeant relayed a message from Waterman that plaintiff "need[ed] to submit another blue slip" before she would treat his chest pain. Id. at exh. 4. The request includes a signature for "P. Reid" and a box is checked next to the statement "scheduled to be seen in HSU." Id. The December 30 request is directed to Mary Miller. Plaintiff wrote that an unnamed nurse "became upset and ended the assessment" when he told the nurse about "chronic and serious pain in [his] chest." Id. at exh. 5. The request includes a signature that the parties agree is supposed to be "Mary Miller" and that is dated December 31, 2011. In addition, the response includes the word "noted" and a checked box next to the statement "treated today." Id.

In defendant Waterman's motion for sanctions, she alleges that plaintiff never submitted those requests and that he has falsified the requests to make it look as if he sought treatment for chest pain on December 28. In support of this allegation, Waterman cites several pieces of evidence.

First, Laurie Tank, a records custodian for the Department of Corrections, submitted

4

the health service requests that the department has on file from plaintiff for the period between December 1, 2011 and January 31, 2012. Dkt. #104-1. Although approximately 50 health service requests from that period are included in the file, the three requests plaintiff submitted with his summary judgment materials are not. However, there is a different request in the medical file from plaintiff dated December 28, 2011, in which plaintiff asks about scheduled lab tests. Id. at Bates number 035.

Second, Waterman testified that all health service requests are supposed to be date-stamped when they are received by the health services unit, but the three health service requests at issue have no date stamp on them. Third, Patricia Reid and Mary Miller submitted declarations in which they denied that they signed plaintiff's December 28, 29 and 30 health service requests. Dkt. ##85 and 87. (Reid and Miller did not testify at the hearing, so I will not consider their declarations in deciding whether to grant defendants' motion.) Finally, Ellen Ray, another records custodian for the department, submitted Mary Miller's time records for December 2011, which show that Miller was not scheduled to work on December 31, 2011, the date she allegedly signed one of plaintiff's health service requests. Dkt. #104-3, exh. 1001.

Plaintiff makes a number of arguments in support of his testimony that he did not fabricate his health service requests. First, he says that health services staff do not always put date stamps on health service requests. At the hearing, plaintiff did not support his testimony with any documents. However, after the hearing, plaintiff submitted health service requests dated December 3, 2011, December 17, 2011, January 25, 2012 and

5

October 22, 2015, that do not have date stamps on them. Dkt. #106, exhs. C-F. In addition, he filed a health service request in which he asked "Nurse Vick" whether she ever forgot to put date stamps on requests. Dkt. #108, exh B. In response, she wrote, "I am human, mistakes I'm sure are made." Id.

Second, plaintiff says that Miller may have made a mistake when she wrote December 31, 2011 as the day she responded to plaintiff's health services request. He says that staff "routinely put the wrong date to make it appear as [though he] was seen on a particular day that they did not" see him. Dkt. #108, ¶ 6. In support of that allegation, plaintiff cites a response to an "interview/information request" in which Waterman admitted that she had written March 3, 2012 as the date that plaintiff had refused a tuberculosis test when the actual date was March 4, 2012. Dkt. #108-1, exh. A.

Plaintiff's evidence shows that prison staff make mistakes from time to time when filling out paperwork. This is not surprising. As recognized by "Nurse Vick," *everyone* makes a mistake at some point. However, this unremarkable fact comes nowhere close to rebutting defendants' evidence that plaintiff fabricated the three health service requests on December 28, 29 and 30.

To begin with, plaintiff points to only four health service requests over a four-year period in which staff failed put a date stamp on the request. In other words, staff do make mistakes, but this type of mistake is the exception rather than the rule. Because the vast majority of the health service requests submitted by the parties were date-stamped, it is highly improbable that three different health service requests over a three-day period about

the same topic would all suffer from the same defect if plaintiff actually had submitted the requests as he says he did. The fact that Mary Miller was not at work on the day she allegedly signed one of the requests simply makes plaintiff's allegations that much more improbable. Although there is some chance that a single health service request would be unstamped or dated incorrectly, the chances are very slim of *all three* requests missing the stamp *and* one nurse putting the wrong date on her response.

Further, plaintiff points to no evidence that would explain why all three of the requests are missing from his medical file. The likelihood that all three were misplaced is very small. This leaves the possibility of a conspiracy to destroy the requests between Waterman and either the record custodians or the nurses who allegedly received plaintiff's requests. However, the existence of such a conspiracy is not supported by any evidence or even common sense. If the nurses somehow predicted that plaintiff might use his requests to help prove a claim in a lawsuit and wanted to protect their coworker, why would they destroy the prison's copy yet return plaintiff's copy to him? Similarly, the records custodian would know that destroying the prison's copy would not stop plaintiff from submitting his own copy. In addition, plaintiff has not identified any reason that a records custodian would engage in such serious misconduct on Waterman's behalf.

There are more reasons to doubt plaintiff's story. First, plaintiff points to no reference he made to these particular health service requests in any other document before he submitted his summary judgment materials. For example, plaintiff attached to his complaint a grievance he filed about the same issue on December 29, 2011, dkt. #1-1, but

7

he says nothing in the grievance about the request or staff's response to it.

In addition, the content of the requests is suspicious because it is dissimilar to the other requests plaintiff submitted in December 2011 and January 2012. In plaintiff's other requests, including those related to his chest pain, he complained about an *ongoing* problem and generally requested information or treatment. E.g., dkt. #104-1, exh. 1000 at Bates no. 46 ("I have vague episodes of vague chest tightness . . . I need to know what is going on with me."); id. at Bates no. 45 ("I am having extreme chest pain . . . I am in constant pain please help me."); id. at Bates no. 42 ("I would like to know what you are going to do about the blood that I'm spitting/throwing up."); id. at Bates no. 41 ("what [were] the results of my chest x-rays?"); id. at Bates no. 39 ("I would like to know what are you going to do about my chest stabbing pains."); id. at Bates no. 24 ("I would like to be retested for hepatitis C."); id. at Bates no. 23 ("Please explain to me why I am having episodes of vague chest tightness."); id. at Bates no. 20 ("Could I be tested for esophagus cancer and stomach cancer?"); id. at Bates no. 16 ("Please explain to me why I'm urinating [a] white substance."). In contrast, plaintiff's December 28, 29 and 30 health service requests are not requests at all. Rather, they are written in the past tense and simply describe plaintiff's version of events. In this way, they are much more similar to a grievance than a health service request. This is consistent with a desire by plaintiff to create a record that supports his version of events.

For all of these reasons, I am persuaded by clear and convincing evidence that plaintiff never submitted the December 28, 29 and 30 health service requests to health care staff.

8

Rather, plaintiff falsified those documents in an attempt to support his claim in case no. 13-cv-742-bbc.

## B. Plaintiff's Allegations of Retaliation

Throughout these cases, plaintiff has been alleging that numerous prison officials have been retaliating against him and attempting to interfere with his ability to litigate. In an order dated February 25, 2015, dkt. #26 (in case no. 13-cv-742-bbc) and dkt. #32 (in case no. 14-cv-399-bbc), I considered plaintiff's allegations that staff in the health services unit were "destroy[ing]" and "removing" medical records from his file in order to "sabotage" his lawsuits. I denied plaintiff's request for "an investigation in this matter" because he did not have any evidence to support his allegations.

In an order dated May 1, 2015, dkt. #46 (in case no. 13-cv-742-bbc) and dkt. #62 (in case no. 14-cv-399-bbc), I considered multiple motions in which plaintiff complained about more alleged misconduct by prison officials. For example, plaintiff alleged that various prison officials confiscated his legal documents in the context of a cell search, including documents that plaintiff said would show that he had "an intimate relationship" with defendant Sandra Ashton and that Ashton lied about sustaining injuries during the February 27, 2013 incident. Dkt. #38 (in case no. 14-cv-399-bbc). I declined to take any action because plaintiff did not explain how documents related to an alleged relationship with defendant Ashton were relevant to his claims and because plaintiff did not explain how the other documents would show that Ashton lied. Dkt. #62 at 7 (in case no. 14-cv-399-bbc).

9

In an order dated June 11, 2015, dkt. #49 (in case no. 13-cv-742-bbc), I again considered plaintiff's allegations of misconduct by prison officials. In particular, he alleged the officials were denying his requests for documents, notary services and library services. I denied his motion because his allegations were too vague or because he did not show that he was prejudiced. Dkt. #49 at 3 (in case no. 13-cv-742-bbc).

In an order dated August 5, 2015, dkt. #81 (in case no. 14-cv-399-bbc), I considered additional similar allegations related to records request and other discovery issues. In addition, plaintiff alleged that prison officials were not allowing him to use legal loans to make photocopies and that an assistant for defense counsel was committing "forgery" by signing counsel's name on letters. I denied all plaintiff's motions, again for lack of evidence or a showing of prejudice.

Finally, in an order dated October 19, 2015, dkt. #88 (in case no. 13-cv-742), I considered plaintiff's allegation that this court "joined in a combined conspiracy with defendants and their attorney against" plaintiff. I denied that motion because plaintiff did not have any evidence to support it.

Plaintiff's current request for sanctions comes from two separate motions, one filed on August 3, 2015, dkt. #52 (in case no. 13-cv-742-bbc), and dkt. #80 (in case no. 14-cv-399-bbc), and another filed on October 5, 2015, dkt. #123 (in case no. 14-cv-399-bbc).

In his August 3 motion, plaintiff made many serious allegations against many prison staff members regarding what he says is retaliation for filing these lawsuits. These allegations included the following (all docket citations are to case no. 13-cv-742-bbc):

- on July 7, 2015, Lieutenant Waller told plaintiff that he would become a "slave" and that all his property "will be trashed," dkt. #52, at 2, ¶ 3;

- on July 14, 2015, officers Jones, McGowen, Beahm and Kapingst handcuffed plaintiff while searching his cell, confiscated affidavits (plaintiff does not say what was in these affidavits) and told plaintiff, "Nigger, this is Waupun, we do not follow no rules, we break them, and we are going to make sure you follow them and that means no affidavits to support your lawsuit," id. at 3, ¶ 10;

- on July 15, 2015, officer Brockman confiscated seven more affidavits that plaintiff says included testimony from other prisoners related to his cases; again, the officer called him a "nigger," id. at 3, ¶ 11;

- on July 17, 2015, officer Walker confiscated "declarations and letters" from other prisoners related to this lawsuit, id. at 4, ¶ 14;

- on July 18, 2015, officer Brockman, acting under the direction of security director Meli and warden Pollard, "remov[ed] all paper work" from plaintiff's cell, id. at 4, ¶ 15;

- on July 20, 2015, nurse Larson pulled plaintiff out his cell, asked him, "do you know how much trouble you are causing by not eating?" and punched plaintiff in the nose, causing his nose to bleed and swell, id. at 4, ¶ 17;

- on July 21, 2015, nurse Larson pulled plaintiff out his cell; Larson stated, "I will teach you niggers about filing complaints" and Larson stuck her finger in plaintiff's anus, id. at 5, ¶ 18;

- on July 22, 2015 several "John Doe officers" took plaintiff to the mental health services unit and "rape[d]" him, causing tearing and bleeding; nurse Larson stated, "give that nigger some ice and tell him to stop sticking things in his butt before he catches an infection," id. at 5, ¶ 19;

- on July 23, 2015, several "John Doe" officers came to plaintiff's cell, threatened to use a taser on him, handcuffed him, and took him to a room that he had never seen before; nurse Larson was present as well; she said, "Nigger do you want this to stop?" and then told the officers to "fuck [plaintiff] real good"; the officers "raped" plaintiff and sprayed him with "gas" and used a taser on him when he "screamed for help," id. at 5-6, ¶ 20;

- on July 24, 2015, officer McGowen told plaintiff, "I was that bitch that

    spread[] your ass cheeks apart and stuck my finger in your ass" and that if he wanted the abuse to stop, "you better obey and do what you're told to do," id. at 6, ¶ 21;

- on July 27, 2015, officer Brockman came to plaintiff's cell, stated that he was going to search plaintiff's cell, handcuffed plaintiff, took him to a "waiting room" and hit him in the left eye with a closed fist, id. at 6, ¶ 22;

- on July 28, 2015, officers Klimmer, Overlien, Waller, Kembel and Brown destroyed "all" of plaintiff's paperwork by turning on the shower in his cell and soaking the papers with water, id. at ¶ 23.

Plaintiff's October 5, 2015 motion includes the following allegations (all docket citations are to case no. 14-cv-399-bbc):

- on September 9, 2015, M. Johnson confiscated plaintiff's legal documents, with the warden's approval, dkt. #123 at 1, ¶ 1;

- on September 10, 2015, M. Johnson falsely accused plaintiff of sexually assaulting defendant Ashton, id. at 1-2, ¶ 2;

- on September 14, 2015, M. Johnson and security director Toni Meli stated that they were going to interfere with plaintiff's litigation by taking all of his writing materials and "placing him on restrictions," id. at 2, ¶ 3;

- on September 16, 2015, officer Beasley sprayed plaintiff with O.C. "all of a sudden," placed him in handcuffs and a restraint chair, id. at 2, ¶ 4;

- on September 16, 2015, Torria Van Buren told plaintiff that officials were placing him on suicide watch to prevent him from contacting the court and to "teach him a lesson about filing lawsuits," id. at 2, ¶ 5;

- on September 19, 2015, two officers came to plaintiff's cell and "all of a sudden" used a taser on plaintiff, id. at 3, ¶ 7;

- on September 21, 2015, Torria Van Buren told plaintiff that she was going to keep plaintiff on suicide watch so that he could not contact the court, id. at 3, ¶ 8;

- on September 24, 2015, officers came to plaintiff's cell, telling him, "niggers like you should learn to listen more" and that plaintiff would be placed on

12

      security restrictions to prevent him from meeting court deadlines, id. at 3, ¶ 9;

- on September 25, 2015, an officer told plaintiff that he was going to write plaintiff false conduct reports so that plaintiff could not come out of his cell or file documents with the court, id. at 4, ¶ 10;

- on September 25, 2015 Teresa McClaren told plaintiff that she was going to keep him in observation so that he would be more easily controlled and so that he would not be able to meet court deadlines; id. at 4, ¶ 11;

- on September 28, 2015, security director Meli told plaintiff that he was going to place plaintiff on security restrictions to prevent plaintiff from meeting court deadlines; id. at 4, ¶ 12.

At the hearing in this court on December 10, 2015, defendants called to testify four of the individuals plaintiff accused in his motions: Donna Larson, Shane Waller, McKenzie Johnson and Tony Meli. Each of them denied any involvement in physically or sexually assaulting plaintiff or otherwise interfering with plaintiff's lawsuits. Plaintiff also testified, primarily repeating the allegations in his motions.

After the hearing, plaintiff filed another document in which he repeated his allegations. Dkt. #156. In addition, he included new allegations regarding events occurring after he filed his motions. In particular, he alleges that several prison staff members told him that they would "make [his] time at Waupun hard . . . if [he] did not dismiss [his rape] investigation." Id. at 3. In addition, plaintiff says that he was placed on a nutra-loaf restriction unfairly. Id. Because those allegations are outside the scope of the pending motions, I have not considered them.

I conclude that plaintiff's testimony is not credible for several reasons. First, in light of the gravity of plaintiff's allegations, it is surprising how few details he gives about what

13

happened to him. Over and over again, plaintiff simply alleges that one or more prison staff members came to his cell, said or did something terrible and then left. He does not describe what led up to these acts or provide any context. Even at the hearing, when plaintiff was free to elaborate on the conclusory allegations in his motion, he provided little new information. In fact, in many cases, plaintiff's testimony consisted of nothing more than reading from his motions.

Perhaps one potential reason for relying so heavily on written materials while testifying could be nervousness about appearing in court. However, nothing about plaintiff's tone or demeanor suggested that he was anxious or scared. He spoke calmly and dispassionately about each of his allegations. And that is a second reason for questioning his credibility. Although he was testifying about shocking misconduct that likely would be traumatic for most individuals, plaintiff's affect revealed no emotion about being a victim of so many serious crimes and harassing acts.

Third, while he was testifying, plaintiff did not mention of some of the most serious allegations in his motions. For example, in his August 3 motion, plaintiff alleged that he was raped by officers *twice*, once on July 22 and again on July 23. However, at the hearing, plaintiff testified about the alleged July 23 incident only. It is difficult to believe that plaintiff would forget about a crime as horrific as a sexual assault.

Fourth, despite plaintiff's reliance on his briefs while testifying, there were discrepancies between his briefs and his testimony. For example, in his brief in support of his August 3 motion, plaintiff alleged that he did not know the officers who sexually

assaulted him on July 23. However, at the hearing, he identified two of the officers as Waller and McGowen. Because plaintiff alleged in his August 3 motion that he had other dealings with those two officers *before* July 23, it makes no sense that plaintiff would have been unable to identify those officers on July 23.

Fifth, plaintiff does not allege that he requested any medical care after any of the alleged physical or sexual assaults. He says the reason is that he would not have received any medical care even if he had requested it, but that testimony is implausible. As discussed above, plaintiff submitted approximately *50* written requests for health care in December 2011 and January 2012 alone. Many of these involved repeated complaints about the same alleged failures to provide care, showing that plaintiff did not hesitate to request care even when he believed that he was unlikely to receive it. Although it is true that Larson was a nurse and plaintiff would be hesitant to request care from the person involved in an assault, there obviously were other staff members from whom plaintiff could have sought treatment if he needed it.

Sixth, plaintiff alleges in both of his motions that officers were confiscating his legal documents repeatedly, but he never identifies with any specificity what was in those documents. Further, it is difficult to believe an allegation that prison officials were interfering with plaintiff's ability to litigate this lawsuit when the docket sheet in both cases shows that plaintiff has filed numerous motions and other documents with the court, including around the times of the alleged interference. In fact, plaintiff does not identify a single relevant document that he was prevented from filing. If such a large number of

15

officials were as intent on stopping plaintiff from litigating as plaintiff says they were, it seems likely that those officials would have been more successful at stopping plaintiff from communicating with the court.

Finally, plaintiff's allegations are improbable on their face, if not approaching fantastic. If plaintiff's allegations were true, it would mean that there is a wide-ranging conspiracy in the Wisconsin Department of Corrections devoted to engaging in brutal and sadistic actions against plaintiff and depriving him of access to the courts. Plaintiff has not identified any reason why so many prison officials would act so maliciously against him. Although plaintiff alleges that officials were retaliating against him for filing these lawsuits, plaintiff is not suing most of the officials that are allegedly retaliating against him. In fact, plaintiff has not cited any evidence that many of the officials even knew about his lawsuits at the time of their alleged misconduct. It defies reason that so many people would risk being fired or criminally prosecuted when plaintiff's lawsuits pose no risk to them personally. In itself, the shocking nature of plaintiff's allegations may not be a reason to find plaintiff incredible. However, when viewed in combination with all the other evidence, it simply confirms that plaintiff's allegations are false.

In sum, it is clear that plaintiff is not entitled to sanctions against defendants or anyone else. Rather, clear and convincing evidence shows that plaintiff should be sanctioned for making false allegations against prison staff members.

C.  Appropriate Sanction

In the October 19, 2015 order setting the parties' sanctions motions for a hearing, I warned plaintiff that, "if the evidence shows that [he] is fabricating his allegations, then I will consider appropriate sanctions, including dismissal of both of his lawsuits pending in this court." Dkt. #88 (in case no. 13-742-bbc), and dkt. # 126 (in case no.14-cv-399-bbc), at 10-11. Even earlier in case no. 14-cv-399-bbc, I told plaintiff about the potential consequences of making false allegations. In particular, in the order screening plaintiff's complaint, I noted that his allegations of excessive force were very similar to allegations against different correctional officers in a previous case he filed with Magistrate Judge Stephen Crocker. Carter v. Belz, No. 12-cv-301-slc (W.D. Wis.). In granting partial summary judgment to the defendants in the 2012 case, Magistrate Judge Crocker found that a "video recording clearly establishes that most of what Carter says simply is not true." Carter v. Belz, No. 12-cv-301-slc (W.D. Wis. Oct. 18, 2013), dkt. #95. In light of plaintiff's previous false allegations, I noted that, in two recent cases, the Court of Appeals for the Seventh Circuit dismissed two cases and then referred them to the United States Attorney for possible prosecution of perjury after concluding that the plaintiff had engaged in a pattern of making false allegations. Neal v. LaRiva, 765 F.3d 788, 790 (7th Cir. 2014); Rivera v. Drake, 767 F.3d 685, 687 (7th Cir. 2014). In light of Neal and Rivera, I told plaintiff that he should consider the reasons that he brought case no. 14-cv-399-bbc and whether his allegations could be supported with admissible evidence.

Because plaintiff has not heeded the court's warning, I conclude that dismissal is an

17

appropriate sanction. The court's authority to dismiss a case for a party's false allegations is well established by Neal, Rivera and other cases. E.g., Hoskins v. Dart, 633 F.3d 541, 543 (7th Cir. 2011) (affirming district court's inherent authority for dismissing case when prisoner plaintiff lied about the existence of other lawsuits); Allen v. Chicago Transit Authority, 317 F.3d 696, 703 (7th Cir. 2003) ("Perjury committed in the course of legal proceedings is a fraud on the court, and it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case."). In fact, in 2004, I dismissed Uhde v. Bitsky, No. 03-cv-323-bbc (W.D. Wis. Apr. 29, 2004), under similar circumstances after holding a hearing and finding that a prisoner falsified documents in an attempt to prove his case.

I recognize that, before dismissing a case, courts must consider whether lesser sanctions are adequate. In this case, I believe that a lesser sanction would not be adequate or effective. As the court of appeals has stated, "perjury is among the worst kinds of [litigation] misconduct." Rivera, 767 F.3d at 686. Further, "[m]onetary sanctions are generally not as effective against a pro se plaintiff proceeding as a pauper." Hoskins, 633 F.3d at 543. Simply excluding the fabricated evidence would not be an adequate sanction because it would not serve as a deterrent to falsifying evidence in the future. Despite an opportunity to do so, plaintiff has not identified any other sanction that would be appropriate under the circumstances of this case.

I acknowledge that plaintiff's false allegations in case no. 14-cv-399-bbc are not directly related to the merits of his claims. However, plaintiff has made these allegations

18

relevant by filing his motions and seeking assistance from the court to protect him from alleged retaliation. The court of appeals has stated that "we do not require a district court to measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction. . . [A] district court's inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." Salmeron v. Enterprise Recovery Systems, Inc.,579 F.3d 787, 796-97 (7th Cir. 2009). Because plaintiff's allegations are so serious and could have done great damage to the accused officials, his actions are a significant abuse of the judicial process. If the only consequence of the false allegations were to deny plaintiff's request for sanctions, this would not "deter future parties from trampling upon the integrity of the court." Id. Accordingly, I conclude that dismissal is an appropriate sanction regardless whether the allegations are directly related to plaintiff's claims. In addition, because I conclude that plaintiff's allegations are malicious, I am assessing two "strikes" against him under 28 U.S.C. § 1915(g). Paul v. Marberry, 658 F.3d 702, 705 (7th Cir. 2011). If plaintiff receives a third strike, he will be unable to proceed in forma pauperis in federal court unless he is in imminent danger of serious physical injury.

Because this is the first time that plaintiff is being sanctioned by the court, I decline to impose additional sanctions at this time. Although defendants ask for a monetary sanction as well, I believe that dismissal is sufficient for now. However, if plaintiff continues to make false allegations in this court and engages in other litigation misconduct, I will

19

consider whether a more severe sanction is appropriate, including a monetary sanction and bar on filing additional lawsuits in this court. Carr v. Tillery, 591 F.3d 909, 920-21 (7th Cir. 2010); Alexander v. United States, 121 F.3d 312 (7th Cir. 1997); Support Systems International Inc. v. Mack, 45 F.3d 185 (7th Cir. 1995).

ORDER

IT IS ORDERED that

1. Defendant Jolinda Waterman's motion for sanctions, dkt. #83 (in case no. 13-cv-742-bbc), is GRANTED and plaintiff Tommie Carter's motions for sanctions, dkt. #52 (in case no. 13-cv-742-bbc) and dkt. ## 80 and 123 (in case no. 14-cv-399-bbc), are DENIED.

2. Both of these cases are DISMISSED WITH PREJUDICE as a sanction for plaintiff's malicious conduct.

3. In accordance with 28 U.S.C. § 2815(g), I am assessing two "strikes" against plaintiff.

4. All other pending motions in these cases are DENIED as moot.

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 2d day of February, 2016.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge